**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| In re: | ) |
| | ) |
| MICHAEL EUGENE TREECE, SR., | ) Case Number: 09-33290 |
| JUDY ANN TREECE, | ) Chapter 7 |
| | ) |
| Debtors. | ) |

**DEBTORS' BRIEF IN OPPOSITION TO MOTION TO COMPEL**
**DEBTORS TO FILE AN AMENDED FORM 22A**

COME NOW the Debtors, Michael and Judy Treece, by their attorneys

The Law Offices of Mueller and Haller L.L.C. and for their brief in

opposition state as follows:

**INTRODUCTION**

The Debtors incorporate the statement of facts included in the

United States Trustee's (UST) Introduction as accurate.  However,

Debtors need to clarify the record that they did disclose the receipt of

unemployment income on Line 9 of the B22A form by claiming that is

was a benefit under the Social Security Act.

**ISSUE**

Can the Debtors exclude the receipt of unemployment

compensation in the calculation of their disposable monthly income

pursuant to 11 U.S.C. § 101(10A)?  If the answer is yes, then the United

States Trustee's motion to compel should be denied.  If the answer is no,

then the motion should be granted.

1

**ARGUMENT**

**I.  UNDER A PLAIN LANGUAGE READING OF THE STATUTE, UNEMPLOYMENT COMPENSATION SHOULD BE EXCLUDED FROM CURRENT MONTHLY INCOME BECAUSE IT FALLS SQUARELY WITHIN THE TERM "BENEFITS RECEIVED UNDER THE SOCIAL SECURITY ACT."**

The Supreme Court has consistently employed a strict plain meaning rule for the Bankruptcy Code. *See Lamie v. U.S. Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 1030 (2004); It has been well established that when the "statute's language is plain, the sole function of the court, at least where the disposition required by the text is not absurd, is to enforce it according to its terms." *Hartford Underwriters,* 530 U.S. at  6. (internal quotations omitted). Moreover, if the plain language of a statute appears to contradict its philosophical foundation, it is not the role of the courts to redraft the statute to bring the two into alignment.  "If Congress enacted into law something different from what it intended, then it should amend the statute to conform to its intent.  It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think. . . is the preferred result." *United States v. Granderson,* 511 U.S. 39, 68 (1994) (Kennedy, J., concurring).

Although the BAPCPA has been roundly criticized as an exercise in muddy draftsmanship, *see e.g.* Henry J. Sommer, *Trying to Make Sense out of Nonsense: Representing Consumers Under the "Bankruptcy Abuse Prevention and Consumer Protection Act of 2005,"* 79 Am. Bankr. L.J. 191(2005) (calling the draftsmanship of the BAPCPA "atrocious"); *In re*

*Sorrell*, 359 B.R. at 172 (clarity of expression is frequently lacking in the BAPCPA), the provisions relating to CMI are straightforward. Section 101(10A)(A) describes CMI as: "the average monthly income from all sources that the debtor receives . . . without regard to whether such income is taxable income." Section 101(10A)(B) excludes from current monthly income "benefits received under the Social Security Act." A plain language interpretation of section 101(10A)(B) leads to the conclusion that unemployment compensation, which is a substantial component of the SSA and is regulated and funded by the Department of Labor and the FUTA, is a "benefit received under the Social Security Act."

Although reported cases are few, at least five courts and many commentators have reviewed this issue. The cases holding that unemployment income should be considered as a benefit under the social security act include *In re Sorrell*, 359 B.R. 167 (Bankr. S.D. Ohio 2007) and *In re Munger*, 370 B.R. 21 (Bankr. D. Mass. 2007). Cases holding that unemployment income does not qualify as a benefit received under the social security act include *In re Kucharz*,418 B.R. 635 (Bankr. C.D.Il. Oct. 28, 2009); *In re Baden*, 396 B.R. 617 (Bankr. M.D. Pa. 2008) and an unreported decision in Alabama in the case of *In re* Washington, Case No. 09-30014 (Bankr. M.D. Ala., May 21, 2009) which is on appeal to the District Court. Briefs have been filed in the appeal and no oral arguments have been set.

**A. UNEMPLOYMENT INCOME SHOULD NOT BE INCLUDED IN THE CALCULATION OF CURRENT MONTHLY INCOME.**

The better reasoned opinions and commentators have found that, based upon the plain language of the statute, unemployment compensation benefits should be excluded from current monthly income. *See Sorrell*, 359 B.R. 167 (Bankr. S.D. Ohio 2007); *In re Munger*, 370 B.R. 21 (Bankr. D. Mass. 2007); 2 COLLIER ON BANKRUPTCY 101.10A (Alan N. Resnick & Henry J. Sommer eds.,16th ed.) (noting that unemployment benefits are provided for in several Titles of the Social Security Act), David W. Allard, *Means Testing, Dismissal & Conversion Under the New Law*, 24-6 Am. Bankr. Inst. J., 8, 74 (July 2005) ("[U]nemployment compensation was also excluded from CMI because it appears that it is a benefit received under the Social Security Act."); David Gray Carlson, *Means Testing: the Failed Bankruptcy Revolution of 2005*, 15 Am. Bankr. Inst. L. Rev., 223, 262-63, (Spring 2007) (referring favorably to *Sorrell's* reasoning for finding that unemployment compensation is a benefit received under the Social Security Act); Henry J. Sommer, *Trying to Make Sense out of Nonsense: Representing Consumers Under the "Bankruptcy Abuse Prevention and Consumer Protection Act of 2005"*, 79 Am. Bankr. L.J. 191, 195 (2005) (unemployment compensation benefits provided for under Titles III, XII, XIII and XV of the Social Security Act).

In finding that unemployment compensation is a "benefit received under the Social Security Act," the court in *Sorrell* began its analysis with

the premise that "the authoritative statement is the statutory text, not

the legislative history or any other extrinsic material." 359 B.R. at 177

(quoting *Exxon Mobil Corp. v. Allapattah Svcs., Inc.,* 545 U.S. 546, 568

(2005)).  It proceeded to review the arguments set forth by the Trustee

within that framework.

First, the Sorrel court rejected the Trustee's argument that the

phrase "benefits under the Social Security Act" was limited to direct

payments from the federal government.  The court noted that the statute

did not limit the broad term "benefits" to direct payments.  The Sorrell

court also examined other section of the Bankruptcy Code that refer to

benefits under the Social Security Act.   Specifically, the court compared

section 362(b)(2) (exceptions to the automatic stay for child support

under § 466 of the SSA), section 704(c)(1)(A)(i) (duties of the Trustee with

respect to state child support agencies created under the SSA), and

section 1302(d)(1)(A)(i) (same), to the language employed in

section 101(10A)(B).  Relying on the rule that "congressional enactments

which contain particular language in one section of a statute, but omit

such particularity in another section, reflect Congress' intention and

purpose in such disparate use," the court concluded that the broader

language of section 101(10A)(B) reflected an intention to provide broader

coverage of the Act in its entirety.  *Sorrell*, 359 B.R. at 183.

Finally, the court held that:

> [I]n consideration of the text of various relevant portions of
> the Social Security Act, United States Supreme Court

language, and a comparison with other statutory text of the
2005 Act, which reference specific provisions of the Social
Security Act, the court holds that unemployment
compensation is one of the 'benefits under the Social
Security Act.'

*Id.*

The court in *Munger* adopted this reasoning.  Based upon "canons
of statutory construction and the *Sorrell* decision," the *Munger* court
found that unemployment compensation is excluded from current
monthly income pursuant to section 101(10A)(B).  370 B.R. at 26.  Like
*Sorrell*, the court noted that when Congress intended to draw a
distinction between specific social security provisions it did so expressly,
as in the case of section 522(d)(10), which provides that a debtor may
claim as exempt:

> (A)    a social security benefit, unemployment
> compensation, or a local public assistance benefit;
>
> (B)    a veterans' benefit;
>
> (C)    a disability, illness, or unemployment benefit
>
> (D)    alimony, support, or separate maintenance, to the
> extent reasonably necessary for the support of the
> debtor and any dependent of the debtor;
>
> (E)    a payment under a . . . plan or contract on account
> of illness, disability, death, age, or length of service,
> to the extent reasonably necessary for the support
> of the debtor . . .

The court found that the phrase "social security benefit," as used
in section 522(d), was narrower than the phrase "benefits under the
Social Security Act, as used in section 101(10A)(B):

> [T]he phrase [benefits received under the Social Security Act]
> is intentionally broad. Sections of the Bankruptcy Code
> distinguish 'unemployment compensation' from 'a social
> security benefit.' . . . The way which Congress chose to
> phrase the references in the sections supports the view that
> 'a benefit received under the Social Security Act' in
> §101(10A)(B) was *purposefully intended to be broader than 'a
> social security benefit.'* 'Unemployment compensation' is
> included in this broader definition.

370 B.R. at 25-26 (emphasis added).

This Court should adopt the holdings of *Sorrell* and *Munger* and should find, based upon the plain language of the statute, that unemployment compensation is a benefit received under the SSA and should be excluded from the calculation of CMI.

**B. THE OPINIONS OF THE COURTS IN *KUCHARZ, BADEN* and *WASHINGTON* WERE INCORRECTLY DECIDED.**
**a. ANALYSIS OF THE *BADEN* AND *WASHINGTON* OPINIONS.**

The Court in *In re Baden,* 396 B.R. 617 (Bankr. M.D. Pa. 2008) case essentially relied upon four propositions for its conclusion that unemployment compensation was found not to be a "benefit received under the Social Security Act" within the meaning of section 101(10A)(B). These four propositions include: (1) that the congressional intent behind the BAPCPA and the amendments it made to section 707(b) was to ensure that all income be included in the calculation of current monthly income; (2) that comparison with the language of section 522(d)(10) indicates that Congress deemed unemployment compensation to be a benefit separate from social

security; (3) that "benefits received under the Social Security Act" refers

to benefits wholly funded, administered and paid by the federal

government; and (4) that current monthly income should be calculated

according to the Internal Revenue Code's definition of gross income.

Debtors maintain that, for the following reasons, *Baden* was

wrongly decided and should not be followed by this Court.

### i. There is no congressional mandate that debtors be required to include unemployment compensation in the calculation of CMI under the means test.

As an initial matter, the *Baden* court determined that

interpretation of section 101(10A)(B) could not be based solely on the

text of the provision, finding that there is an inherent ambiguity in that

language.  Specifically, the court stated:

> It is unclear whether a 'benefit received under the Social Security
> Act,' was meant to be all encompassing since it did not refer to a
> specific provision of the act or whether it was an alternative way of
> referring to social security benefits, which are distinguished from
> unemployment compensation in other provisions.  Since the
> language of this provision is unclear, it is necessary to look
> beyond the plain language to correctly interpret the statute.

396 B.R. at 622.

The court then turned to the legislative history of the BAPCPA for

guidance and found that Congress had two primary concerns:

"(1) Protecting the Bankruptcy system from being abused by ensuring

that those who could afford to pay their debts did pay; and (2) protecting

education and retirement savings from being drained by creditors." *Id.*
The court concluded that excluding unemployment compensation from
the calculation of CMI would be antagonistic to both concerns.
Specifically, the court stated that "[a]llowing the unemployed to retain
any excess funds they receive while failing to pay their bills runs
contrary to Congress' goal of preventing abuse by those who can afford
to pay a portion of their bills." *Id.*

   This position was addressed and rejected by the courts in *Sorrell*
and *Munger*.  The court in *Sorrell*, warned against placing too much
emphasis on the oft-cited phrase, "Those who can pay, should pay,"
noting that Congress itself did not always adhere to this principle,
specifically excluding other sources of income, including certain
retirement funds, repaid loans, and charitable contributions, from
consideration of the debtor's ability to pay. *Sorrell,* 359 B.R. at 178; *see
also In re Barfknecht,* 378 B.R. 154 (Bankr W.D. Tex. 2007) (no bad faith
where chapter 13 debtor retains social security disability benefits even
though inclusion of such benefits in the estate would significantly
increase repayment to creditors).  This principle has been recognized in
this Court by Judge Meyers in the case of *In re Nance,* 371 B.R. 358
(Bankr. S.D. Ill. 2007).

> Similarly, the Court is not persuaded that the "clear" goal of BAPCPA was
> to "ensure that debtors repay creditors the maximum they can afford." In
> re Zimmerman, 2007 Bankr. LEXIS 410, 2007 WL 295452, at * 8 (Bankr.
> N.D. Ohio 2007) (citing H.R. Rep. No. 109-31). Congress excluded several
> sources of income from the disposable income calculation, including
> repayment of 401(k) loans and Social Security Act benefits, thereby
> calling into doubt whether maximum repayment to creditors was its

> main intent. See In re Hanks, 362 B.R. 494, 500 (Bankr. D. Utah 2007)
> (questioning whether maximum repayment was the goal of BAPCPA).
> Further, by focusing on repayment to creditors as Congress' ultimate
> goal, proponents of this approach ignore other potential competing goals
> of Congress under BAPCPA, particularly the desire to eliminate judicial
> discretion. Id. It is clear from the Chapter 7 means test, the adoption of
> standardized expense calculations for above-median debtors, and the
> calculation methods for determining "projected disposable income" that a
> major goal of Congress was to replace judicial discretion with specific
> statutory standards and formulas.

*Id.* at 366.

Contrary to the conclusion in *Baden,* while the BAPCPA may have had as its impetus the desire to curtail perceived abuse of chapter 7 bankruptcy, it did not eradicate the original intent of the bankruptcy laws to afford a debtor a fresh start by protecting certain assets and income from creditors.  *See* Jensen, *supra*, at 490 (the original intent of Chapter 7 bankruptcy was to serve the public good by distribution of a debtor's assets and allowing him to enjoy a fresh start).  *Baden* invoked congressional concerns that may relate to broad issues addressed by the 2005 legislation, but they do not relate to the specific amendment at issue here.  In fact, there is no inherent contradiction between the purposes behind the BAPCPA and the preservation of monies received under the SSA.  The exclusion from CMI of *all* benefits received under the SSA promulgated the congressional purpose of protecting Americans from the financial burdens created by loss of employment.  This founding principle of the SSA also underlies the BAPCPA.  As noted by the *Sorrell* court, Congress' desire to retain the balance between the two competing interests is evidenced by its protection of a variety of debtor's assets.

The congressional record is also clear that Congress sought to protect unemployment benefits.  Both Rep. Conyers and Sen. Kennedy emphasized loss of employment income in presenting to Congress the amendment that became section 101(10A)(B).  *See* Section IIA, *supra*. Moreover, when Representative Conyers presented the amendment to the House he explicitly offered it as a means to protect a debtor's unemployment compensation.  These amendments passed without challenge.

Therefore, while the passage of the BAPCPA reinforced and strengthened the abuse prevention aspects of the bankruptcy laws, it did not do away with the consumer protection component.  The *Baden* court analyzed congressional intent with no specific discussion of the language at issue and cannot be deemed persuasive in the current debate.

If Congress intended to limit its exclusions from CMI in the manner suggested by the UST, it knew how to do so.  The fact that it did not is a clear indication that courts should not impose their own judicial limitations in contravention of the clear statutory language and legislative history.

> ii. **Congress' separation of unemployment compensation from "social security benefits" in section 522(d)(10) is not an indication that Congress intended to treat unemployment compensation as outside the Social Security Act for purposes of section 101(10A)(B).**

The *Baden* court's analysis of the statutory text as compared to other provisions in the Code is likewise erroneous.  In comparing the

text of section 101(10A)(B) with the other language in the Code, the

*Baden* court cited only section 522(d)(10) as an example of a specific

provision in which Congress distinguished unemployment benefits from

the benefits available under the SSA.  Where *Munger* relied on

section 522(d)(10) as evidence that Congress knew how to distinguish

between specific benefits when it intended to do so, the *Baden* court

cites that provision as evidence that Congress intended to exclude

unemployment compensation from the definition of "social security

benefits" and, therefore, include unemployment compensation in the

calculation of CMI:

> [T]his Court views the distinction between unemployment
> compensation and social security benefits [in §522(d)(10)] as
> a manifestation of Congress' intent that the Bankruptcy
> Code treat the current and temporary replacement of wages
> administered by the state differently than future benefits
> associated with old age, ordinarily administered by the
> federal government.

*Baden,* 396 B.R. at 621.

This conclusion steadfastly ignores the basic principle of statutory

construction that differing language in two provisions of an Act be given

different meanings.  *Russello v. United States,* 404 U.S. 16, 23 (1983)

("We refrain from concluding here that the differing language in the two

subsections has the same meaning in each.").   By equating Congress'

reference to "social security benefits" in section 522(d), and the reference

to "benefits received under the Social Security Act" in § 101(10A)(B), the

*Baden* court failed to recognize the significance of the different language

that Congress employed in the two provisions.  That Congress chose
different, and broader, language in section 101(10A)(B) supports the view
that "benefits received under the Social Security Act," as used in that
section, enjoys the broadest possible construction.

The *Baden* court's interpretation of the disparate terms also
ignores the historical and colloquial meaning of the term "social security
benefits."  Since 1935, when the SSA was enacted, the term "social
security" has frequently been used to refer to the Federal Old Age,
Survivors, Disability and Hospital Insurance program (consisting of
federal old age benefits and Medicare). Wilbur J. Cohen, *The Development
of the Social Security Act of 1935: Reflections Some Fifty Years Later,* 68
Minn L.Rev. 379, 380, 397 (1983).  Congress referred to "social security
benefits" in section 522(d)(10) and then went on to separately list other
benefits that find their genesis in the Social Security Act, such as
disability, public assistance, and unemployment benefits.  It is
reasonable to conclude that the reference to "social security benefits"—
without reference to the SSA itself—was limited to the colloquial
understanding of that term.  The separate listing of unemployment
compensation in that section merely indicates Congress' desire to ensure
protection for those benefits in addition to the benefits commonly
understood as "social security."  It has no interpretive value, though, in

connection with a provision, like section 101(10A)(B), that makes specific reference to the SSA.[1]

The individual listing of benefits applicable under section 522(d)(10) suggests exclusivity—those benefits not listed were not intended to be exempt under that provision.  The opposite is true with respect to section 101(10A)(B) where Congress elected to refer broadly to the Social Security Act in its entirety.  The use of different terms leads inexorably to the conclusion that different meanings are intended.  Had Congress meant to exclude certain social security benefits in section 101(10A)(B) it would have been a simple matter to do so.

### iii.  The distinction between benefits received directly from the federal government and those received from state governments is irrelevant to the interpretation of section 101(10A)(B).

The *Baden* court was also persuaded that unemployment compensation is not a benefit received under the SSA based on the structural differences between unemployment compensation and certain other social security benefits.  The court found that "including unemployment compensation as a benefit 'received under the Social Security Act' is a strained interpretation . . .[,]  as unemployed individuals do not receive 'benefits under the Social Security Act,' but rather 'under programs adopted by their states.'"  *Baden,* 396 B.R. at

---

[1]Indeed, applying the *Baden* court's argument consistently would lead to a finding that "disability" and "illness" benefits (which, like unemployment compensation, are identified separately in 11 U.S.C. § 522(d)(10)(C), are included in the calculation of CMI—even though they are benefits available under the SSA.

621 (quoting Wedoff, *supra*, at 247).  It held that the BAPCPA uniformly treats "the current and temporary replacement of wages administered by the state differently than future benefits associated with old age, ordinarily administered by the federal government." *Id.*  The Baden court thus held that the extent of state involvement in a benefits programs determines whether the recipient derives the benefits under the SSA. Benefits paid directly through the Social Security Administration would be deemed "benefits received under the Social Security Act," while those received through a state program established under the SSA would not.

The *Sorrell* court rejected that argument, reasoning that unemployment compensation has the requisite nexus to the federal government:

> A component of this analysis is a brief understanding of unemployment compensation law, which involves both state and federal law, specifically the Social Security Act. States may, but are not required, to enact unemployment compensation laws.  If, however, a state does enact an unemployment compensation law, it is required to comply with a series of federal mandates.  See 42 U.S.C. § 1321 (Eligibility requirements for transfer of funds; reimbursement by State; application; certification; limitation).  These mandates are inextricably entwined with the Social Security Act.  For example, the Secretary of Labor must certify each state's compliance with the Social Security Act.  To the extent a state law is not in compliance with the Social Security Act, it would be invalid under the Supremacy Clause of the United States Constitution.

*Sorrell.* 359 B.R. at 181 (citations omitted).  Where unemployment benefits have the same underlying purpose as other provisions of the Social Security Act—that of maintaining "the recipient at subsistence

levels," during a time of financial exigency—the *Sorrell* court found no

logical basis for distinguishing between unemployment compensation

benefits and other benefits under the Social Security Act.  *Id.* at 182

(quoting *Java*, 402 U.S. at 131-32).  Moreover, the court found that "the

plain meaning of the words in § 101(10A)(B) contain no distinction

between federal and state benefits administration.  The applicable text

does not speak of 'payment,' direct, indirect, or otherwise, but instead

contains the unambiguously broader term 'benefits.'"  359 B.R. at 181.

The court in *Munger* agreed, finding that "benefits" as used in

§ 101(10A)(B) is a more inclusive word than "payments" and that

Congress chose to exclude from CMI benefits received by virtue of the

Social Security Act rather than the more narrow reading of "payments"

made directly from the federal coffers with no state administration.

There, the court found that "[t]he word 'benefit' does not draw a

distinction between unemployment compensation and other benefits,"

and that Congress did not intend to exclude unemployment

compensation from "benefits received under the Social Security Act."

370 B.R. at 23.

The overall construct of the SSA fully supports the conclusion

reached by the courts in *Sorrell* and *Munger*.  The extensive reach of the

SSA includes many programs that, like the unemployment compensation

program, states administer through grants from the federal government

and that operate with substantial oversight by the Secretary of Labor.  As

the Act currently stands, its federal/state programs include Title I –

Grants to States for Old-Age Assistance; Title III – Grants to States for

Unemployment Compensation Administration[2]; Title IV – Grants to

States for Aid and Services to Needy Families with Children and for

Child-Welfare Services; Title V – Maternal and Child Health Services

Block Grant; Title X – Grants to States for Aid to Blind; Title XIV – Grants

to States for Aid to Permanently and Totally Disabled; Title XIX – Grants

to States for Medical Assistance Programs; Title XX – Block Grants to

States for Social Services; and finally, Title XXI – State Children's Health

Insurance Program.  With the exception of the unemployment

compensation laws (Titles III, IX and XII), these Titles are generally

referred to as the "welfare" programs.  Cohen, *supra*, at 381.

On the other hand, the federally administered and funded

programs include:  Title II – Federal Old-Age, Survivors, and Disability

Insurance Benefits (OASDI); Title VIII – Special Benefits for Certain World

War II Veterans; Title XVI – Supplemental Security Income for Aged,

Blind, and Disabled (SSI); Title XVIII – Health Insurance for Aged and

Disabled (Medicare).  The OASDI and Medicare are what is typically

meant when people refer to "social security."  Dana M. Muir, *From

YUPPIES to GUPPIES: Unfunded Mandates and Benefit Plan Regulation,* 34

Ga. L. Rev. 195, 199 n.30 (Fall 1999); Wilbur J. Cohen, *The Development*

---

[2]Other Titles involving Unemployment Compensation are Title IX – Employment
Security Administrative Financing, and Title XII – Advances to State Unemployment
Funds.

*of the Social Security Act of 1935: Reflections Some Fifty Years Later,* 68

Minn L.Rev. 379, 380 (1983).

Even OASDI, Medicare and SSI, though primarily federal

programs, have some state involvement in their operations.  OASDI

provides for state agencies to make the determination as to whether a

claimant is disabled. 42 U.S.C. § 421(a)(1).  SSI contemplates

coordinated federal-state payments to recipients as well as funding to the

states for their complementary programs through Title XIX of the Act.

The Medicare program likewise includes a state component with sections

1395z and 1395aa of that Title providing for the Secretary of Labor to

consult with State agencies for determination of conditions of

participation by providers of services under the Medicare program.

The *Baden* court deemed "benefits received under the Social

Security Act," to be limited to those that are colloquially known as "social

security" benefits.  By holding that only those programs that are funded

and administered without state involvement are "benefits received under

the Social Security Act," the *Baden* court would require Chapter 7

petitioners to include in CMI all benefits except those benefits received

under Titles II (OASDI), XVI (SSI) and XVIII (Medicare).  Chapter 7

debtors would have to include in CMI calculations all benefits received

under the programs involving grants to the states, such as: Titles I (old-

age assistance), III (unemployment compensation), IV (child welfare), V

(maternal and child health services), X (aid to the blind), XIV (disability),

XIX (medical assistance), XX (social services) or XXI (children's health insurance).

The *Baden* result would ultimately contort the statutory language and purpose of § 101(10A)(B) by confining the congressional reference to "the Social Security Act" to only those benefits received under two of eleven Titles of that Act. This Court should not adopt such an absurd construction.

### iv. The Court should not determine "Income" for purposes of § 101(10A) with reference to the Internal Revenue Code.

Finally, the court in *Baden* also agreed with Judge Wedoff's reasoning that unemployment compensation should not be deemed a "benefit received under the Social Security Act" because the language of § 101(10A) suggests that its interpretation should be guided by reference to the Internal Revenue Code. *Baden,* 396 B.R. at 623. Section 101(10A) provides that CMI should include: "the average monthly income from all sources that the debtor receives . . . without regard to whether such income is taxable income." Under the Internal Revenue Code, that which is "not taxable" is "gross," and 26 U.S.C. § 85 provides that gross income includes unemployment compensation. *Id.* (citing Eugene R. Wedoff, *Means Testing in the New § 707(b),* 79 Am. Bankr. L.J. 231, 247 (2005)).

This view, based upon Congress' reference to taxable income, does not withstand scrutiny, and several courts have rejected it. Addressing the argument in the context of the inclusion or exclusion of private

disability payments, the Ninth Circuit held that the "plain language of

the Bankruptcy Code . . . does not support this interpretation":

> The phrase "without regard to whether such income is
> taxable income" in 11 U.S.C. § 101(10A)(A) reflects
> Congress' judgment that the Internal Revenue Code's
> method of determining taxable income does not apply to the
> Bankruptcy Code's calculation of CMI. Moreover, where
> Congress wishes to define a term in the Bankruptcy Code by
> reference to the Internal Revenue Code, it clearly knows how
> to do so. For example, Congress imported the Internal
> Revenue Service's Local and National Standards for expenses
> into the means test calculation. *See* 11 U.S.C. §
> 707(b)(2)(A)(ii)(I).

*Blausey*, 552 F.3d at 1132-33; *see also In re Weigand*, 386 B.R. 238, 242

(9th Cir. BAP 2008) (finding plain language "reflects a clear congressional

intent that Tax Code concepts for determining taxable income are

inapplicable to a determination of current monthly income."); *In re*

*Bembenek*, No. 08-22607, 2008 Bankr. LEXIS 3003 (Bankr. E.D. Wisc.

July 2, 2008) (same).

  This argument is supported by the 7th Circuit's recent ruling in *In*

*re Ross-Tousey*, 549 F.3d 1148, 1160 (7th Cir. 2008) in which the Court

held:

> In addition to the fact that neither the statutory text nor
> history support using IRM methods in the means test, there
> are also practical reasons why it is inappropriate to look to
> the IRM, namely that the substantial discretion allowed to a
> revenue officer under the IRM is inconsistent with the
> purpose of the means test to adopt a uniform, bright-line
> test that eliminates judicial discretion.

*Id.* at 1160.

  It would have been a simple matter for Congress to have

defined CMI as "gross income" under the Internal Revenue Code if

that had been the intention.[3]   Specifying that income should be determined "without regard" to taxability suggests that Congress had no intention of suggesting that the Internal Revenue Code should guide the definition of "income" in the Bankruptcy Code.

### b.  ANALYSIS OF THE *KUCHARZ* OPINION.

Judge Perkins of the Central District of Illinois recently issued an opinion that unemployment compensation should not be deemed a "benefit received under the Social Security Act" for purposes of calculating current monthly income under 11 U.S.C. §101(10A)(B).  *In re Kucharz,*418 B.R. 635 (Bankr. C.D.Il. Oct. 28, 2009)

Debtors respectfully maintain that Judge Perkin's findings are erroneous.

The court in *Kucharz* began its analysis by stating that the issue of whether unemployment compensation is a "benefit received under the Social Security Act" is a "surprisingly difficult question."  The court found the source of the ambiguity in the use of the word "under" in the phrase

---

[3] In his article, Judge Wedoff himself acknowledges a weakness in his argument:

> The guidance of the Internal Revenue Code as to the meaning of "income" in §101(10A)(A) of the CMI definition is, however, undercut by the statement in §101(10A)(B) that "income" includes "any amount paid by any entity other than the debtor, on a regular basis for the household expenses of the debtor or the debtor's dependents."

> This provision has the effect of treating child support and foster care payments as "income" even though they are excluded from "gross income" in the Internal Revenue Code.

Wedoff, *supra,* at 245.

"benefits received under the Social Security Act." The court found that the word meant "required by" or "in accordance with," and that pursuant to this phrase, benefits must be more than "related to," "envisioned by" or "induced by" the SSA.  It went on to find that because unemployment benefits are paid by the states through state programs they did not fall "under" the SSA. *Id.*

Debtors maintain, however, that while it is indeed difficult to arrive at the conclusion that unemployment compensation is *not* a benefit received under the Social Security Act, it is a simple matter to read the statute as written and find that it *is* a benefit under the Social Security Act.  WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 2000) defines "under" as either "subject to the authority, control, guidance, or instruction of," or "within the group or designation of."  Either of these definitions would dictate in favor of a finding that unemployment benefits, which are overseen by the Secretary of Labor under the auspices of the Social Security Act, and which are among the twenty one Titles of the Social Security Act, are benefits received "under" the Social Security Act.  This is further supported by the United States Supreme Court which ruled that

> See Ardestani v. INS, 502 U.S. 129, 135, 112 S. Ct. 515, 116 L. Ed. 2d 496 (1991) (noting that a thing that is "'under'" a statute is most naturally read as being "'subject to'" or "'governed by'" the statute).

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 128 S. Ct. 2326, 2332 (U.S. 2008)

In addition to providing funding and oversight of state unemployment compensation plans, as described in the *Kucharz* opinion, the SSA also provides for training of state employees (42 U.S.C. § 1107), research of the unemployment compensation programs (42 U.S.C. § 1106), and an advisory counsel (42 U.S.C. § 1108).

Moreover, the extensive reach of the SSA includes many programs that, like the unemployment compensation program, states administer through grants from the federal government and which operate with substantial oversight by the Secretary of Labor.  As the Act currently stands, it includes twenty one Titles of which two are administrative. Therefore, there are nineteen programs included in the SSA which directly advance the social causes the Act was created to address.  At least twelve of those nineteen Titles constitute federal/state programs. Those include programs giving grants to states for such things as: old-age assistance, (Title I); aid and services to needy families with children (Title IV); maternal and child health care (Title V); mental retardation (Title XVII); aid to the blind (Title X); aid to the permanently and totally disabled (XIV); medical assistance programs (Title XIX); social services (Title XX); and children's health insurance programs (Title XXI).  These Titles are generally referred to as the "welfare" programs.  Wilbur J. Cohen, *The Development of the Social Security Act of 1935: Reflections Some Fifty Years Later,* 68 Minn L.Rev. 379, 380, 381 (1983).  The

unemployment compensation provisions are found in Titles III, IX, and XII.

On the other hand, the federally administered and funded programs include: Federal Old-Age, Survivors, and Disability Insurance Benefits (OASDI) (Title II); Special Benefits for Certain World War II Veterans (Title VIII); Unemployment Benefits for Seamen (Title XIII); Supplemental Security Income for Aged, Blind, and Disabled (SSI) (Title XVI); and Health Insurance for Aged and Disabled (Medicare) (Title XVIII). The OASDI and Medicare are what is typically meant when people refer to "social security." Dana M. Muir, *From YUPPIES to GUPPIES: Unfunded Mandates and Benefit Plan Regulation,* 34 Ga. L. Rev. 195, 199 n.30 (Fall 1999).

While the federal/state programs which make up the majority of the SSA involve both state and federal components, even the "federal" programs such as OASDI, Medicare and SSI, have some state involvement in their operations. OASDI provides for state agencies to make the determination as to whether a claimant is disabled. 42 U.S.C. § 421(a)(1). SSI contemplates coordinated federal-state payments to recipients as well as funding to the states for their complementary programs through Title XIX of the Act. The Medicare program likewise includes a state component with sections 1395z and 1395aa of that Title providing for the Secretary of Labor to consult with State agencies for

determination of conditions of participation by providers of services under the Medicare program.

Thus, a determination that only that which does not include state involvement can be deemed to be "under" the SSA, would eviscerate the exclusion in §101(10A)(B) altogether.  Even a more conservative approach in which only those programs that, like unemployment compensation, function through state programs that are funded and overseen by the Secretary of Labor under the SSA, would eliminate twelve of the nineteen programs included in the SSA.  Essentially, the court in *Kucharz* would interpret Congress' phrase "benefits received under the Social Security Act" to mean "benefits received under the Social Security Act with the exception of Titles I, III, IV, V, VI, IX, X, XII, XIV, XVI, XVII, XIX, XX, and XXI."

It would be patently absurd for Congress to create a statute that had to be interpreted in such a way, especially given Congress' specification of discrete provisions of the Act in other sections of the BAPCPA.

The *Kucharz* court next conducted a "contextual analysis" in which it looked at the policy and object behind the law, finding that "[t]he major purpose of the means test implemented by BAPCPA is to identify those Chapter 7 filers who have the ability to repay a portion of their debts and to force them into Chapter 13 if they wish to obtain bankruptcy relief." Although the court noted that there is general disagreement as to

whether "the formulaic calculation of projected disposable income for
over-median debtors in Chapter 13 is the mandatory end result for plan
confirmation purposes, or only the starting point," it concluded without
specifying that it was adopting either approach, that "CMI formula serves
a predictive function." The court found that unemployment
compensation payments were predictive of the income the debtor could
expect to receive in the future and that, "[t]he fallacy of using $0 during
periods of temporary unemployment as a predictor of future earnings
once the debtor is reemployed seems obvious." The court concluded that
this contextual analysis weighed in favor of finding that unemployment
compensation is not a benefit under the SSA.

The *Kucharz* court's reasoning does not apply to the provision at
issue herein. The very name of the 2005 Act, "Bankruptcy Abuse
Prevention and Consumer Protection Act," illustrates the balancing act
that bankruptcy law is, and always has been, intended to perform. The
2005 Act while clearly intended to prevent abuse is also intended to
protect consumers. Thus, the court's premise that the BAPCPA was
intended to catch can-pay debtors, while perhaps true, is not dispositive
of the specific issue at bar. The provision at issue herein relates to the
other side of the scales—Congress' desire to protect consumers by
preventing certain income from becoming part of the estate. This was
made clear in both the statutory text, which Debtors contend is clear and

unambiguous, as well as in the congressional record surrounding
enactment of the provision at issue.

As to statutory construction, section 101(10A)(B) is both plain and
inclusive in its language: all benefits received under the SSA are
excluded from the calculation of CMI.  As explained above, the *Kucharz*
court's narrow interpretation of the word "under" is strained and illogical.
Congress' awareness of the differing constructions that can be attached
to references to the SSA is evident by other provisions in the Code in
which specific SSA benefits are singled out for special treatment.  See
e.g. 11 U.S.C. § 362(b)(2) (exceptions to the automatic stay for child
support under section 466 of the SSA); § 704(c)(1)(A)(i) (duties of the
Trustee with respect to state child support agencies created under the
SSA); § 1302(d)(1)(A)(i) (same); § 522(d)(10) (specified exemptions).  In
contrast, Congress chose to use the broadest possible language in its
reference to the SSA in section 101(10A)(B) where it did not limit the
benefits in any way.  Thus, the court's imposition of limitations on
Congress' broad language is unjustified by the statutory text.

As to Congress' intent behind adoption of the exclusion from CMI,
the record is far more clear than the court in *Kucharz* finds.  Both the
Senate and the House of Representatives considered proposals as early
as 1999 to exclude "benefits received under the Social Security Act" from
the definition of CMI.  Introducing the amendment to the Senate, Senator
Edward Kennedy noted the many financial hardships that

27

disproportionately affect older Americans, specifically including loss of

employment among those difficulties. *Bankruptcy Reform Act of 1999:*

106th Cong., 1st Sess., 145 Cong. Rec. S 14678 (Nov. 17, 1999)

(statement of Sen. Kennedy) ("in too many circumstances in our country

today, the elderly are discriminated against in terms of employment.").

The amendment generated no debate and passed at that session. *Id.* at

14680.

    In the House, Representative John Conyers moved to recommit the

Bankruptcy bill as it then stood, with an amendment identical to Senator

Kennedy's.  In his opening remarks Rep. Conyers specifically mentioned

unemployment compensation as a benefit to be protected by his

amendment:

> As the law currently stands, any senior is eligible for
> bankruptcy relief.  The bill, however, would force millions of
> seniors living on fixed incomes into mandatory repayment
> plans.  This is because there is no exclusion from the
> definition of "income" for payments received for Social
> Security, retirement, for disability insurance, for
> supplemental security income, or for ***unemployment
> insurance***.

*Bankruptcy Reform Act of 1999: Hearing on H.R.833 before the Committee*

*of the Whole House,* 106th Cong., 1st Sess., 145 Cong. Rec. H 2655,

2770 (statement of Rep. John Conyers) (emphasis added).  The motion to

recommit passed without debate and became part of the final bill.

    Thus, the congressional record demonstrates that when Senator

Kennedy and Representative Conyers proposed the amendment to

exclude social security benefits from the calculation of CMI, Congress

specifically contemplated that "benefits received under the Social Security Act" would include unemployment compensation.

Finally, the court in *Kucharz* reasoned that remedial legislation should be read broadly to effectuate its purpose—in this case "shifting can-pay debtors from Chapter 7 to Chapter 13." As explained above, even under this construction of the legislation the court's construction of the phrase "benefits received under the Social Security Act" is more than narrow, it is both contrary to the plain language of the statute and contrary to the express intent of Congress.

**II.  The legislative history of both the BAPCPA and the SSA mandates a finding that unemployment compensation is a "benefit received under the Social Security Act" for purposes of calculating CMI.**

In the event that this Court finds that the statutory text is ambiguous, the congressional record fully supports a finding that unemployment compensation is a "benefit received under the Social Security Act" within the meaning of section 101(10A)(B).

When Congress chose to exclude social security benefits from calculation of CMI, it was motivated in part by consideration of the financial distress caused by loss of employment and the need to protect unemployment compensation from creditors. Likewise, a significant impetus for the passage of the SSA in 1935 was to combat the harm that job loss caused to individuals and to society as a whole. Therefore, the legislative history of both Acts militates in favor of a finding that

unemployment compensation is a "benefit received under the Social

Security Act" within the meaning of 11 U.S.C. § 101(10A)(B).

### A. The legislative history of BAPCPA demonstrates Congress' intent to include unemployment benefits in the scope of section 101(10A)(B) and, thus, to exclude them from CMI.

Bankruptcy is a balancing act.  It has two main purposes: to

provide a fresh start for the debtor and to facilitate the fair and orderly

repayment of creditors to the extent possible.  Susan Jensen, *A

Legislative History of the Bankruptcy Abuse Prevention and Consumer

Protection Act of 2005,* 79 Am. Bankr. L.J. 485, 490 (Summer 2005)

("When an honest man is hopelessly down financially, nothing is gained

for the public by keeping him down, but, on the contrary, the public good

will be promoted by having his assets distributed ratably as far as they

will go among his creditors and letting him start anew.") (quoting Cong.

Rec. H.R. Rep. No. 55-65, at 43 (1897)).  With that philosophy in mind,

bankruptcy laws included a presumption in favor of granting chapter 7

relief.

Over time, the public perceived a misuse of chapter 7 bankruptcy

protection.  Congress was persuaded that chapter 7 relief, designed to

protect those who found themselves in unexpected financial

circumstances caused by illness, job loss, or death of a spouse, had

instead become a tool to relieve debts incurred by people who had merely

spent recklessly.  Jensen, *supra,* at 495.  After over a decade of

discussion, drafting and redrafting, the Bankruptcy Abuse and

Consumer Protection Act was signed into law in 2005.  BAPCPA

eliminated the presumption that chapter 7 debtors are entitled to relief

and created a new test—the means test—under which a chapter 7 case

could be dismissed based upon a presumption of abuse.  *See In re*

*Sorrell,* 359 B.R. 167, 178 (Bankr. S.D. Ohio 2007).

The Senate and the House of Representatives both considered

proposals as early as 1999 to exclude "benefits received under the Social

Security Act" from the definition of CMI.  Introducing the amendment to

the Senate, Senator Edward Kennedy noted the many financial

hardships that disproportionately affect older Americans, such as

increased health care costs and loss of health insurance, more pressure

from predatory lenders, and loss of employment:

> This amendment is particularly important to seniors.
> Between 1991 and 1999 the number of people over 65 who
> filed bankruptcy grew by 120 percent.  If we look over the
> figures from 1991 to 1999 by age of petitioner, we see the
> growth of those that are going through bankruptcy primarily
> have increased in the older citizen age group.  This is
> primarily a result of the downsizing, dismissing older worker
> and because of health care costs—primarily they have been
> dropped from health insurance.

*Bankruptcy Reform Act of 1999:* 106th Cong., 1st Sess., 145 Cong. Rec. S

14678 (Nov. 17, 1999) (statement of Sen. Kennedy).  In proposing the

amendment, Senator Kennedy emphasized the importance of social

security benefits to older citizens unable to maintain employment at the

levels they sustained as younger employees: "in too many circumstances

in our country today, the elderly are discriminated against in terms of

employment." The amendment generated no debate and passed at that session. *Id.* at 14680.

In the House, Representative John Conyers moved to recommit the Bankruptcy bill as it then stood, with an amendment identical to Senator Kennedy's. In his opening remarks Rep. Conyers specifically mentioned unemployment compensation as a benefit to be protected by his amendment:

> As the law currently stands, any senior is eligible for bankruptcy relief. The bill, however, would force millions of seniors living on fixed incomes into mandatory repayment plans. This is because there is no exclusion from the definition of "income" for payments received for Social Security, retirement, for disability insurance, for supplemental security income, or for **unemployment insurance**.

*Bankruptcy Reform Act of 1999: Hearing on H.R.833 before the Committee of the Whole House,* 106th Cong., 1st Sess., 145 Cong. Rec. H 2655, 2770 (statement of Rep. John Conyers) (emphasis added). Rep. Conyers read a letter from the National Council of Senior Citizens in support of the amendment, in which it was stated that the bill as it stood without the amendment "would force millions of seniors to make mandatory payments based on a definition of income that would include payments for social security, disability, *unemployment compensation*, supplemental security income and other income security and welfare needs." *Id.* (emphasis added). The motion to recommit passed without debate and became part of the final bill.

Thus, the congressional record demonstrates that when Senator Kennedy and Representative Conyers proposed the amendment to exclude social security benefits from the calculation of CMI, Congress specifically contemplated that "benefits received under the Social Security Act" would include unemployment compensation.

As Judge Perkins in the *Kucharz* case wrote, the language in this provision did not change.

It is clear, therefore, that Congress' intention behind the language of the BAPCPA was to exclude unemployment compensation from calculation of current monthly income as a "benefit received under the Social Security Act."

**B.  State unemployment compensation laws, created under the auspices of the Social Security Act and regulated by the Secretary of Labor, are one of the core purposes of the Social Security Act.**

Not only does the legislative history of the BAPCPA provide unmistakable guidance in this case, but the history and purposes of the SSA are in perfect harmony with the conclusion that unemployment compensation is a "benefit received under the Social Security Act" for purposes of calculating CMI.

President Franklin D. Roosevelt introduced the SSA in 1935 as part of the New Deal.  The purpose of the Act was to provide for the general welfare by establishing a system of federal old-age benefits and by enabling the states to make more adequate provisions for aged persons, blind persons, dependent and crippled children, maternal and

child welfare, public health, and the administration of state

unemployment compensation laws.

(http://www.ssa.gov/OP_Home/ssact/title00/0000.htm).

In 1934, President Roosevelt created the Committee on Economic

Security in recognition of Congress' interest in "federal grants to states

for the needy aged and for some federal legislation in the field of

*unemployment compensation.*"  Wilbur J. Cohen, *The Development of the*

*Social Security Act of 1935: Reflections Some Fifty Years Later,* 68 Minn

L.Rev. 379, 383 (1983) (emphasis added); *see also* Joel F. Handler,

*Symposium: The Legacy of Goldberg v. Kelly; A Twenty Year Perspective:*

*"Constructing the Political Spectacle": Interpretation of Entitlements,*

*Legalization, and Obligations in Social Welfare History,* 56 Brooklyn L.Rev.

899, 914 (Summer 1990) (the first major task of the Social Security

reformers was to provide unemployment insurance.)  In the original 1935

report to President Roosevelt, the Committee on Economic Security

recommended a program of unemployment insurance as a first line of

defense for workers ordinarily steadily employed.  It was believed that

unemployment compensation for a limited period would "carry workers

over most, if not all periods of unemployment in normal times without

resort to any other forms of assistance."  *Cal. Dep't of Human Res. Dev. v.*

*Java,* 402 U.S. 121, 130-31 (1971) (quoting *Report of the Committee on*

*Economic Security: Hearings on S. 1130 Before the Senate Comm. on*

*Finance,* 74th Cong., 1st Sess., 1311, 1321-1322 (1935)).

The United States Supreme Court explained the importance of

addressing the social ills that were the impetus for creating the

unemployment compensation system in the SSA:

> The evils of the attendant social and economic wastage
> [caused by unemployment] permeate the entire social
> structure.  Apart from poverty, or a less extreme impairment
> of the savings which afford the chief protection to the
> working class against old age and the hazards of illness, a
> matter of inestimable consequence to society as a whole, and
> apart from the loss of purchasing power, the legislature
> could have concluded that unemployment brings in its wake
> increase in vagrancy and crimes against property, reduction
> in the number of marriages, deterioration of family life,
> decline in the birth rate, increase in illegitimate births,
> impairment of the health of the unemployed and their
> families and malnutrition of their children.

*Carmichael v. S. Coal & Coke Co.,* 301 U.S. 495, 516-17 (1937).

From its inception in 1935, therefore, the SSA has had two major

social insurance components:  the Federal Old Age, Survivors, Disability

and Hospital Insurance ("OASDHI") program, including Title II and Title

XVIII (Medicare) of the SSA, and the federal-state unemployment

compensation program, Title III and Title IX of the SSA.

As originally contemplated by the Committee on Economic

Security, the unemployment compensation provisions of the SSA, like

many Titles in that Act, outline a joint federal-state program.  Payments

to recipients are partially funded by federal grants, which are themselves

funded through the Federal Unemployment Tax Act, 42 U.S.C. §§ 1101-

1105 ("FUTA"), and the administration of state plans is funded by the

SSA.  42 U.S.C. § 501 (2004); *Java,* 402 U.S. at 125.  The FUTA also

provides for training of state employees (§ 1107), research of the unemployment compensation programs (§ 1106), and an advisory counsel (§ 1108).  Through this system, the federal government is able "to furnish federal money for the administrative expenses of state unemployment compensation programs as an inducement to the states to adopt programs that would achieve the larger objects [of humane assistance and macroeconomic benefits]."  *Jenkins v. Bowling,* 691 F.2d 1225, 1229 (7th Cir. 1982).

Eligibility for federal funds is contingent upon the Secretary of Labor's certification of a state program after finding that it conforms to federal requirements spelled out in detail in section 503 of the SSA. *Java*, 402 U.S. at 125; *Sorrell,* 359 B.R. at 181.  Pursuant to section 503 a state must, among other things, pay unemployment compensation claims "when due," provide a fair and impartial hearing, and allow a claimant to deduct health insurance or income tax in accordance with a program approved by the Secretary of Labor.  Furthermore, a state must make periodic reports to the Secretary of Labor and make information available to the Secretary of Labor concerning individual claimants.  If a state's unemployment compensation plan does not meet these requirements, federal funding stops unless and until the state plan comes into compliance.  42 U.S.C. § 503(b).  Additionally, a state law that conflicts with any of these provisions may be deemed invalid.  *Java,* 402 U.S. at 121 (enjoining California's unemployment compensation

regulation because it conflicts with the "when due" provision of the Social Security Act.)

Under this construct, therefore, there is more than merely a financial connection between the SSA and state unemployment compensation laws.  The state laws are created and administered according to guidelines set forth by the SSA, the administrative aspects of such laws are paid for by the federal government, and a substantial portion of the benefits are paid through federal tax trusts.  Moreover, the provision of unemployment compensation was a substantial concern driving President Roosevelt and the Committee on Economic Security to propose the SSA in the first place.  State unemployment compensation laws are extensively tied to the SSA both in terms of its regulatory provisions and in terms of its original purpose to insure against financial ruin as a result of circumstances beyond the control of the recipient.

For these reasons, Debtors urge this Court to find that unemployment compensation is a benefit received under the SSA, to be excluded from CMI under section 101(10A)(B).

## CONCLUSION

The plain language of the definition of CMI, as well as the history and purposes of the BAPCPA and the SSA, lead to only one conclusion: that unemployment compensation is a "benefit received under the Social Security Act" under § 101(10A)(B).  The Debtors respectfully ask the Court to deny the United States Trustee's motion to compel.

## NOTICE OF ELECTRONIC FILING AND
## CERTIFICATE OF SERVICE BY MAIL

STATE OF ILLINOIS            )                    Case No:    09-33290
                             )          SS
CITY OF BELLEVILLE    )              Chapter    7

     Kelley Geralds, being duly sworn, deposes and says:

     Deponent is not a party to the action, is over 18 years of age, and resides in St. Clair County, Illinois.

     On January 25, 2010, Deponent electronically filed with the Clerk of the U. S. Bankruptcy Court **Debtors' Brief in Opposition to Motion to Compel Debtors to File an Amended Form B22A**.

     The Deponent served electronically the **Debtors' Brief in Opposition to Motion to Compel Debtors to File an Amended Form B22A** to the following parties:

U. S. Bankruptcy Court


U.S Trustee

Dana Frazier

And served by mail to the following parties:

by depositing a true copy of same, enclosed in a postage paid properly addressed wrapper, in a Belleville City Branch, official depository under the exclusive care and custody of the United States Postal Service, within the State of Illinois.

     By: /s/ Kelley Geralds